(No. 6209—

DONALD S. CAPLAN and PERE MARQUETTE SKI CORPORATION, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed February 14, 1977.*

397

CHARLES H. DELANO, Attorney for Claimants.

WILLIAM J. SCOTT, Attorney General; WILLIAM E. WEBBER, Assistant Attorney General, for Respondent.

HOLDERMAN, J.

Claimants on July 19, 1971, filed with this Court a claim for alleged damages resulting from the cancellation of a lease between Donald S. Caplan and the State of Illinois entered into under date of October 1, 1968. The lease granted Claimant Caplan the right to construct a ski lift in Pere Marquette State Park at a site known as Williams Hollow. Throughout the proceedings and in this opinion, this particular site is referred to as Site 1. The lease was to run from January 1, 1969, through December 31, 1993. The lessee, referred to in the lease as Concessionaire, was to provide certain improvements, including one chair lift, parking lot, warming house, day lodge with restaurant facility and all facilities necessary to operate a ski area. It was agreed that the Concessionaire was to have the chair lift in operation by January 1, 1971.

After the lease was executed, Claimant Caplan formed a corporation known as Pere Marquette Ski Corporation which succeeded to the lessee's rights and proceeded to lay plans for the ski area, including making a profile of the land terrain, arranging for the construction of a chair lift in France by the Pomalift Company specifically for the profile of the slope at Site 1. Also, the State cleared trees at Site 1.

On May 13, 1969, the State, through the Department of Conservation, wrote the Claimant a letter re-

questing that Claimant discontinue action in construction of this chair lift. The letter requested a 30-day discontinuance of any construction.

With the letter, the State enclosed a letter signed by Paul Kilburn and John Wanamaker of the Biology Department of Principia College at Elsah, Illinois. The substance of the letter was that the construction of a ski lift at Site 1 would be a detriment in that it might spell the doom of the bald eagles. It pointed out that there were over 60 of these birds who roosted there through the winter. It was contended that the ravine selected for the ski development was a major roosting area for the bald eagles. They recommended further construction of the ski area should not be allowed. As a consequence, the chair lift went into storage.

On June 9, 1969, the State, through the Department of Conservation, wrote Claimant again and stated that Claimant was not to start any construction or erection work and to keep the equipment crated. The impression left by the letter was that the State was concerned with the public safety involved and no mention was made of any detriment to bald eagles.

On July 3, 1969, the Director of the Department of Conservation wrote Claimant on behalf of the State declaring that the lease was null and void and of no effect, contending that the act of the Department was ultra vires.

Thereafter, the parties negotiated an amended lease which called for construction of a ski area five miles east of Site 1. This new site is referred to in the proceedings as Site 2. The new lease specifically reserved to Claimant all rights and causes of action occasioned by the denial of the use of land under the original contract. The new lease was dated October 8, 1970, and contained the following language:

5. It is further agreed that the Concessionaire, by agreeing to substitute the tract of land herein described, and surrendering his right to use the land described in the lease agreement, does not waive or release any and all claims or causes of action occasioned by the State having denied him the use of the land originally described in said Lease.

6. It is further agreed that the substitution of the real estate herein provided for is, and was, made for the benefit, and at the insistence and request of the State of Illinois, Department of Conservation, and not for any purpose of the Concessionaire.

Claimant contends that at Site 2 it encountered problems not present at Site 1. He states that there was no road into the area; no parking facilities; no intermediate slope; water was nearly a mile away; three buildings on the grounds were deteriorating; it was 3/4 of a mile from the highway and five miles from the heart of the peak where the people would be; that the chair lift had to be redesigned for the new slope. In the complaint filed, Claimant demanded an award in the amount of $225,855.50 and submitted a detailed bill of particulars.

On August 25, 1971, there was filed in the record a letter from the Department of Conservation to the Attorney General which was signed by the Director of the Department. The letter was in the form of an answer to the complaint admitting the substance of the allegations, but pleading ignorance as to the amount of compensation, if any, to which Claimant was entitled.

On June 12, 1972, the State filed a Motion to Dismiss contending that the original lease would violate Title 16, Section 668 of the United States Code and was, therefore, void. The Motion to Dismiss was previously denied by this Court. The argument in the Motion is the gist of the State's case for damages.

Title 16, Section 668 of the United States Code provides as follows:

Whoever, within the United States or any place subject to the jurisdiction thereof, without being permitted to do so as provided in sections 668-668d of

this title, shall take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or in any manner, any bald eagle commonly known as the American eagle, or any golden eagle, alive or dead, or any part, nest or egg thereof of the foregoing eagles, shall be fined not more than $500 or imprisoned not more than six months, or both; Provided, That nothing in said sections shall be construed to prohibit possession or transportation of any bald eagle, alive or dead, or any part, nest or egg thereof, lawfully taken prior to June 8, 1940, and that nothing in said sections shall be construed to prohibit possession or transportation of any golden eagle, alive or dead, or any part, nest or egg thereof, lawfully taken prior to the addition to said sections of the provisions relating to preservation of the golden eagle. As amended Oct. 24, 1962, Publ. L. 87-884, 76 Stat. 1246.

As used in sections 668-668d of this title "whoever" includes also associations, partnerships, and corporations; "take" includes also pursue, shoot at, wound, kill, capture, trap, collect, or otherwise willfully molest or disturb; "transport" includes also ship, convey, carry, or transport by any means whatever, and deliver or receive or cause to be delivered or received for such shipment, conveyance, carriage or transportation. June 8, 1940, c 278, Section 4, 54 Stat. 251.

It is a theory of the State, as disclosed by the arguments made, that the building of a ski lift would be a willful disturbance of the bald eagles and that such disturbance is prohibited by Title 16, U.S.C.A.; that an agreement to do anything which is forbidden by a valid statute is void whether the forbidden act is malum prohibitum or malum per se. It is argued that the contract must be declared void, as it was against public policy since no person may lawfully do that which has a tendency to be injurious to the public or against the public good. The State refers to *Illinois Law and Practice,* Contracts, Ch. 7, §151, 152, 153, 191, 196, and 198.

The Claimant contends that the Respondent is prohibited from raising the issue of public policy since such issue was not joined by the pleadings. This Court has previously entered an order to the effect that the question of public policy has been put in issue by Respondent's Motion to Dismiss. See Order of May 19, 1975.

Claimant urges that Title 16, Section 668 of the United States Code does not apply to the land use

contemplated by the Claimant and further takes the position that even if it does apply, the State has failed to sustain its burden of proof that the proposed construction at Site 1 of a ski lift would "molest or disturb" the roosting of the bald eagles. This position points up the fundamental issue underlying the case before this Court insofar as liability is concerned.

It is clear that at the time the State terminated the lease it was acting on recommendation of outside sources, which recommendations were in the nature of an appeal to stop the construction since it was known that bald eagles roost in the area in the winter months. At the time of the lease termination, the State did not have strong evidence that the construction of the ski lift would necessarily "disturb" the roosting of the eagles. Apparently the State felt it did not wish to take the chance to find out and decided not to risk possible disturbance. This may well have been a judicious thing to do but does not determine the rights flowing therefrom.

The Claimant argues that Title 16 does not, by its terms, prohibit a lawful use of land whenever it appears that eagles may indirectly be disturbed, and that members of Congress, according to the committee reports, were not concerned with indirect disturbance but rather a direct and immediate threat by hunters and egg collectors. Claimant's position is fairly well taken in this regard. However, we do not think it necessary to base a decision on that interpretation of Title 16. We prefer to make our determination on whether or not the State has proved by competent evidence that the ski lift would, in fact, make a disturbance to the bald eagle to the extent and in a manner which Title 16 prohibits.

The record contains an evidentiary deposition of Terrence N. Ingram. Mr. Ingram had been certified as a

naturalist by the State of Wisconsin. He was president of Apple Valley Environmental Association and a director for Environmental Workshop in Wisconsin and Canada; also a director of the Illinois Audubon Society. He testified that in general eagles have several roosts. They will have roosts on a river bottom, that is, where there are large trees surrounded by larger ones which act as a buffer zone. This they use in mild weather. But when the weather is more severe, they will go into a valley to roost to get out of the wind.

Mr. Ingram testified he visited Site 1 in May of 1970. This was at a time there were no eagles roosting. He said he was the one responsible for the Director of the Department of Conservation negating the contract. Note, however, that the State cancelled the lease in June, 1969, almost a year before Mr. Ingram visited this Site.

He testified that during severe weather eagles have to have a roost in a valley rather than a river roost. On a river roost, the eagles have to expend an extra amount of energy to keep the body temperature up. With the loss of body temperature, they have to go into the body fat which has DDT in it. The result is that using that fat, there may be enough poison to go to the brain and kill them, or it might affect reproduction. By going to the valleys, they are not exposed to that stress. Any disturbance of their roosting in the valley would cause them to fly out. Any person walking within a quarter of a mile would cause such a disturbance.

He stated that if a ski lift had gone in on Site 1, the birds would not be using the valley as a roost. When asked, however, how that would affect the eagles as to population mortality, he replied that he didn't know how many valleys there were and that a Dr. Wanamaker would be better to testify to that.

403

When asked about the decline of the eagles, Mr. Ingram stated he didn't know what the reasons were. He didn't have any facts and admitted that, with regard to saving birds, all he would be testifying to would be speculation.

The testimony of John Wanamaker is also in the record in the form of an evidentiary deposition. Dr. Wanamaker was a professor of Biology at Principia College, Elsah, Illinois. He had a doctorate from Cornell University; a masters in ornithology; was a student of conservation; and had written a number of articles for various nature magazines, principally in the area of conservation and the conservation of wild life. The campus of Principia is about 18 miles from Marquette Park lodge.

Dr. Wanamaker testified that they had a winter study dating back to 1941 involving the feeding and roosting habits of the eagles in the Williams Canyon, the Site 1 area. He stated that he had seen eagles roosting in the Williams Hollow every year from the time they were first shown to him as a student at the college back in 1939. He stated that eagles use the roosting area during off feeding, or night time, and usually one species; that in case of migratory species, the same area would be used annually; that he had observed at the most 100 eagles roosting in the area of Site 1.

When asked if there were other bird roosts in that general area, he stated that there was one small roost that he knew of; that Site 1 location was the only large roosting area of a permanent winter nature that he knew of. He was asked whether or not he had an opinion as to what the effect the construction of the ski lift and skiing activities would have been on eagles using the roost area at Site 1. He replied that a disturbance of this

area would force the birds to abandon that particular eagle roost and that the birds would scatter and this would be the end of the flock. On cross examination, however, Dr. Wanamaker admitted that there was one other equally suitable hollow for roosting in the area of Site 1. He described the roosting area as one where there were large trees with large limbs to support their weight without the interference of smaller branches so they could have easy access in and out and be protected from the winds during the cold winter. He also testified that insecticides, herbicides, and public shooting were the biggest dangers to eagles.

He further said he agreed that as far as the effect of a loss of a roosting site was concerned, there was no scientific evidence as to what that would have on a flock of eagles. The following questions and answers were asked:

Q. Now Doctor, with respect to a roost, what is the best way to determine what would happen if eagles were to lose a particular roost, if you know?

A. Yeah, if the roosts were to be a loss such as in this case here, I think the most effective way would be simply we do have enough people making observations along the Mississippi to be able to judge over a period of time what happened to the very number of birds and I think that would give us the information (sic). That's about the only way I could concede to do it.

Also, the following:

Q. But with respect to the eagles, from any scientific basis the only concrete statements I think that can scientifically be made is that the removal of the roost would cause them to move from Williams Hollow?

A. I'm just —

Q. Isn't that correct?

A. I would disagree with that statement. I'd modify it.

Q. How would you modify it, Doctor?

A. I would say that we don't know what the effect of removal would have on the birds. I don't think you have any basis for saying we do. I wish we did.

Q. And I gather from the material that I've read and from your testimony here today that that is the situation with respect not only to yourself but all experts in this field?

A. (Nodding in the affirmative.)

Q. You'll have to answer, she can't mark down a nod, Doctor.

A. Yes, yes.

It appears from the state of the record that the State cancelled the lease based on the suggestion of parties interested in the bald eagle. Thereafter, it persuaded the Claimant to accept a new area but permitted Claimant to include a clause in the amended lease reserving whatever rights he had to damages arising out of the cancellation. The record indicates that the State felt it worthwhile to cancel the lease even if it were liable for damages.

We have no quarrel with the attitude of the State, but the Claimant's rights cannot be obliterated based on speculative evidence. Nor do we have quarrel with the witnesses Wanamaker and Ingram who apparently are dedicated to taking all precautionary measures to protect the American eagle and trying to safeguard the eagle from any possible disturbance. It cannot be said,

however, that the testimony satisfactorily meets the burden of proof on the State. It could well be that the ski lift operation would disturb the roosting habits of the bald eagle in the area of Site 1 in Pere Marquette Park. It could well be that this disturbance would have an effect on the flock. The proof, however, is speculative and insufficient in this regard to deny Claimant rights to damages. It would be just as appropriate, from the legal proof here, to prohibit the use of insecticides and herbicides in any area known to furnish eagles their source of food.

It may well have been judicious for the State to cancel the lease as a matter of policy even lacking the clear right to do so. Our holding, however, is that the Claimant is entitled to recover.

The damages must be limited to those we believe to be directly arising out of the cancellation of Site 1 and not include extra expenditures attributable to obtaining and preparation of Site 2. Site 2 was accepted voluntarily by Claimant and he must have known, or at least is presumed to have known, of the additional expenses required at Site 2 over Site 1. He voluntarily undertook these expenses when he entered into the new lease.

We are, therefore, entering judgment for the Claimant for certain items of damages as appear in the record.

Claimant has itemized in particular his claimed damages and introduced evidence in support of each item. He made the following expenditures and claims, and they are appropriate items of damages for which he should be compensated.

The items of expenditure are shown below and our determination is indicated after each item.

*Item 1.* Expenditure for feasibility studies in the amount of $3,693.49 is hereby allowed. This involved a preliminary study of the area and determination of the compatability of the slopes for skiing.

*Item 2.* Engineering work at Site 1 in the amount of $6,820.00 is hereby allowed.

*Item 3.* Expenses of travel of Claimant in connection with the original lease in the amount of $5,667.42 are allowed.

*Item 4.* Personal expenses of Claimant, such as phone calls and so forth relative to Site 1 in the amount of $435.96 are allowed.

*Item 5.* Legal expenses of Claimant relating to negotiating and drafting original lease in the amount of $800.00 are allowed.

*Item 6.* Legal expenses incurred in the amount of $2,809.45 in negotiating for the amended lease are not allowed.

*Item 7.* Personal expenses in connection with Site 2, such as telephone calls, in the amount of $704.35 are not allowed.

*Item 8.* Depreciation in the amount of $8,500.00 for one year is allowed.

*Item 9.* Salaries for area manager and president of the corporation for a period of one year, April, 1969, to April, 1970, in the amount of $22,500.00 are allowed.

*Item 10.* Storage of ski lift due to shut down of construction in the amount of $1,760.00 is allowed.

*Item 11.* Interest on Harron Engineering Company unpaid bill in the amount of $1,683.00 is not allowed.

*Item 12.* Additional costs due to delay in construction in the amount of $7,742.36 are not allowed.

*Item 13.* Estimated profits for one year lay off in the amount of $48,000 are not allowed as they are too speculative.

*Item 14.* Additional costs to provide water at Site 2 in the amount of $29,678.00 are not allowed.

*Item 15.* Building tower at new site in the amount of $27,353.00 is not allowed.

*Item 16.* Adjusting ski lift equipment to accommodate new site in the amount of $17,842.36 is allowed. This item appears to be expenses incurred directly in connection with mitigation of damages.

*Item 17.* Additional costs for engineering, surveying and consultant work at Site 2 in the amount of $7,595.00 are not allowed.

*Item 18.* Additional costs for erecting the ski lift at Site 2 over Site 1 in the amount of $8,118.98 are allowed. This is similar to the item of making the necessary changes in the ski lift.

*Item 19.* Alterations of the chair lift to fit new profile in the amount of $2,841.46 is allowed.

*Item 20.* Additional excavational costs for beginner's slope and parking lot at Site 2 in the amount of $64,650.00 are not allowed.

*Item 21.* Legal fees negotiating for new lease at Site 2 in the amount of $1,500.00 are not allowed.

## SUMMARY

We are, therefore, awarding a total of $78,979.67 to Claimant as shown below:

| | |
|---|---|
| Item 1 | $3,693.49 |
| Item 2 | 6,820.00 |
| Item 3 | 5,667.42 |
| Item 4 | 435.96 |

| | |
|---|---|
| Item 5 | 800.00 |
| Item 8 | 8,500.00 |
| Item 9 | 22,500.00 |
| Item 10 | 1,760.00 |
| Item 16 | 17,842.36 |
| Item 18 | 8,118.98 |
| Item 19 | 2,841.46 |
| TOTAL | $78,979.67 |

Judgment for Claimant in the amount of Seventy-Eight Thousand Nine Hundred Seventy-Nine and 67/100 Dollars ($78,979.67) is hereby entered.